# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 19, 2015

## STATE OF TENNESSEE v. DEANTY MONTGOMERY

**Appeal from the Criminal Court for Knox County**
**No. 100682     Steven W. Sword, Judge**

_____

**No. E2014-01014-CCA-R3-CD – Filed May 28, 2015**

_____

The Defendant, Deanty Montgomery, appeals as of right from his jury convictions for aggravated assault, unlawful possession of a weapon, and misdemeanor reckless endangerment, which resulted in an effective five-year sentence. On appeal, the Defendant raises the following issues for our review: (1) whether the trial court properly permitted the State's argument that the Defendant was engaged in unlawful activity and was, therefore, not excused from the duty to retreat under a theory of self-defense; (2) whether the trial court committed error during jury deliberations in its response to a question from the jury about a person's duty to retreat when engaged in an unlawful activity; and (3) whether the evidence is sufficient to support his convictions. Following our review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and ROBERT H. MONTGOMERY, JR., JJ., joined.

Patrick T. Phillips, Knoxville, Tennesee, for the Appellant, Deanty Montgomery.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Randall E. Nichols, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

This case arises out of a June 9, 2012 confrontation between the Defendant and Maurice Davis ("the victim") in front of the Walter P. Taylor Homes' market in

Knoxville, which resulted in the Defendant's shooting the victim multiple times. Thereafter, on November 27, 2012, a Knox County grand jury charged the Defendant in a five-count indictment with the following: Count 1 – attempted first degree murder; Count 2 – employment of a firearm during the commission of a dangerous felony; Count 3 – employment of a firearm during the commission of a dangerous felony by one having a prior conviction for a dangerous felony; Count 4 – unlawful possession of firearm by one having been convicted of a felony drug offense; and Count 5 – aggravated assault. See Tenn. Code Ann. §§ 39-12-101, -13-102, -13-202, -17-1307, & -17-1324.

Officer Lee Shaw of the Knoxville Police Department ("KPD") testified that he patrolled the Walter P. Taylor Homes area in June 2012 and responded to a call concerning a shooting in front of the market on June 9, 2012. Upon his arrival, he saw the victim lying behind a van, which was parked approximately fifteen to twenty feet from the front entrance of the market. Officer Shaw observed that the victim was suffering from multiple gunshot wounds, so he called for an ambulance and secured the scene.

Several shell casings were found on the scene leading "from the back of the van towards the northeast," and "bullet impacts" were seen on the van and a nearby newspaper stand, in addition to the victim's wounds. A total of five shell casings were recovered and sent to the crime lab for testing.

KPD Investigator Lance Halseth was able to speak with one eyewitness at the scene and later with the victim after his arrival at the University of Tennessee ("UT") Medical Center where he received treatment for his injuries. From his investigation, Inv. Halseth developed the Defendant as a suspect and prepared a photographic array for the victim to view. The victim identified the Defendant as the shooter,[1] according to Inv. Halseth, and a warrant was issued for the Defendant's arrest. Inv. Halseth also asked the market's clerk for security footage of the shooting, but he was told that the camera was not working at that time.

Registered Nurse Dennis Downhour testified that he treated the victim when he arrived at UT Medical Center on June 9, 2012, and that he observed multiple gunshot wounds to the victim's shoulder, hand, and legs. The victim was immediately taken to surgery due to the femoral fracture in his leg, which "can be very dangerous" due to the amount of blood loss, according to Nurse Downhour. After reviewing his notes, Nurse Downhour could not definitely say whether the Defendant was shot in the back of the shoulder or if it was merely an exit wound.

---

[1] The victim invoked his Fifth Amendment rights and refused to testify at trial.

-2-

The Defendant was arrested in the weeks that followed, and following waiver of his <u>Miranda</u>[2] rights, he spoke with Inv. Halseth on July 18, 2012.  The Defendant's statement was played for the jury.

In the statement, the Defendant described the events as a "drug deal gone bad" and provided the following details to Inv. Halseth.  The Defendant stated that a cousin had called him and advised that he had a large quantity of crack cocaine for sale if the Defendant knew of any interested buyers.  Thereafter, the Defendant was contacted by the victim, also a familial relation, who coincidently was seeking to make just such a purchase.  Because it was family, the Defendant agreed to facilitate the exchange, referring to himself as the "middleman" in the transaction.  The Defendant then brokered a deal between the victim and his cousin for $1,125-worth of crack cocaine, which took place on June 7, 2012.  A few hours later, the victim contacted the Defendant, advising him that his customers did not like the taste of the crack cocaine.  The Defendant offered to return with the victim to the seller's residence, but the victim did not show up.

The Defendant told Inv. Halseth that, during the early morning hours of June 9, 2012, the victim, along with the victim's father, Maurice Johnson, confronted the Defendant about the money that they believed was owed to the victim.  According to the Defendant, the victim pulled a TEC-9 semi-automatic pistol on him.  The Defendant claimed that they forced him into the car and that they drove to the seller's house to demand a refund.  However, when they arrived at the house, no one answered the door.  They later let the Defendant go.

The Defendant maintained that, later that day, he called the victim and offered to reimburse him for half of the money he paid for the drugs.  While en route to Walter P. Taylor Homes, the Defendant heard from several people that the victim was with his father at the Walter P. Taylor Homes complex looking for the Defendant, was armed, and was threatening to kill him.

Once the Defendant arrived at Walter P. Taylor Homes, he stopped to speak with L'Amour Sly and Tomichael Bennett.  While talking, the Defendant saw the victim and his father walk past him headed towards the nearby market.  Although they did not stop to speak to him, the Defendant said he could see the outline of the TEC-9 inside the victim's backpack at that time.  According to the Defendant, he wanted to speak with the victim, so he followed the victim inside the market.  He stated that he did so in order to appease the victim and negotiate an agreeable outcome.

---

[2] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 471-75 (1966).

Because the victim was with several friends while inside the store, the Defendant went outside and waited for the victim to exit. Once outside, the Defendant again told the victim that he would give him half of the cocaine purchase price, but the victim was not satisfied with that offer, stating that the Defendant was trying to "play" him. The Defendant responded that he was only trying the resolve the matter. He then saw the victim walk behind the van, heard him cursing, and he could see that the victim was attempting to retrieve something from inside his backpack. The Defendant then pulled out his weapon and warned the victim not to get the gun out of the bag. However, according to the Defendant, the victim began to run away while trying to get inside the bag, and he fired at the victim "six or seven" times in self-defense.

Although the Defendant said L'Amour Sly and Tomichael Bennett witnessed these events, Inv. Halseth confirmed that he never spoke with these individuals following the Defendant's interview to confirm the Defendant's story. That concluded the State's proof.

The Defendant presented several witnesses in his defense. First, L'Amour Sly testified that, on June 9, 2012, he was at Walter P. Taylor Homes and stopped to talk with Tomichael Bennett and the Defendant. As they were conversing, Mr. Sly saw the victim and the victim's father walk past them. According to Mr. Sly, the victim had a TEC-9 in his backpack, and the victim's father had black gloves and a handgun in his pockets. Mr. Sly, along with Mr. Bennett and the Defendant, proceeded to the neighborhood market, where they went inside and made some purchases. When Mr. Sly exited, he saw the victim and his father "standing on the other side of the van" that was parked in front of the store and the Defendant "standing with his back against the door." Mr. Sly heard the victim and the Defendant talking, and the conversation began "getting heated."

Mr. Sly saw the victim turn towards the van and walk to the opposite side while taking off his backpack. The victim's father, who was standing behind a metal newspaper receptacle at this point, started putting his black gloves on, so Mr. Sly thought "[s]omething fixing to go down." According to Mr. Sly, the Defendant walked around to the front of the van, and then the victim "pull[ed] the gun up [and] squeeze[d] off two shots"; the Defendant went for his pistol and returned fire. When the victim fell to the ground, his father fired "four or five" shots at the Defendant, using the newspaper stand "for cover[.]" Mr. Sly saw the Defendant leave going one way, and the victim's father leave going another, but only doing so after he "picked up the gun from the [victim] and picked up the backpack[.]" Before the victim's father was able to "cut [the Defendant] off[,]" the Defendant got in a car and rode away, according to Mr. Sly.

Mr. Sly was asked if the Defendant had "an opportunity to safely withdraw from the situation[.]" He replied, "I mean, he could have walked away, but they was in a—they was pretty much following him to make sure that he didn't go nowhere." Mr. Sly agreed that there were many people present in the Walter P. Taylor Homes area that day, including kids playing. He further agreed that there was a large open area next to the store that the Defendant "could have retreated to[,]" although he would have been turning his back on two armed men. Mr. Sly confirmed that he had a felony conviction for possession of marijuana with intent to sell.

James Johnson, an inmate in the county jail, testified that he worked at the Walter P. Taylor Homes' market in June of 2012 but was off on the day of the shooting. According to Mr. Johnson, the security surveillance system was operational during that time; when the disk covering that day was full, the owner asked him to clear the disk; and before he deleted it, he watched the footage of the shooting. On that disk, Mr. Johnson saw a man dressed in black standing in front of the van, and he saw the Defendant and the victim talking while standing toward the back of the van. Mr. Johnson believed that the man in black was carrying a pistol. According to Mr. Johnson, he saw the man in black "running behind the car," and it appeared that they were "trying to ambush" the Defendant. Mr. Johnson also saw the victim take his backpack off and attempt to get something from inside. He never actually saw the victim with a weapon. Mr. Johnson believed "all the guns were in play" before the victim fell to the ground. According to Mr. Johnson, the man in black tried to retrieve something from under the van, and he then grabbed the victim's backpack and ran from the scene, never to return.

Tomichael Bennett, previously convicted of selling a counterfeit controlled substance and of felony possession of a Schedule III controlled substance, testified for the Defendant and gave his recollection of the events. Prior to the events at the market, Mr. Bennett saw the victim and his father walking around Walter P. Taylor Homes looking for the Defendant. The victim was wearing a red backpack that appeared heavy, and the bag "hung[, s]o it had to be a gun or something in it," according to Mr. Bennett. Mr. Bennett saw a "reflection" of a gun inside the victim's father's pants pocket.

Later at the market, the Defendant was "on a wall by the store" when the victim and his father exited. Mr. Bennett saw the victim walk towards the Defendant, and they had a conversation; he saw the victim's father go the other way towards the newspaper stand. The victim then moved towards the front of the van and started "fumbling with this red little backpack" and pulled out what appeared to be a TEC-9. This was the first time Mr. Bennett had seen the weapon. The Defendant then shot the victim. Mr. Bennett also observed the victim's father pick up the red backpack and the victim's handgun after the victim had been shot. According to Mr. Bennett, other than himself,

the victim, the victim's father, the Defendant, and Mr. Sly, no one else was outside of the market at this time.

A private investigator hired by the Defendant, Thomas Ham, testified that he interviewed the victim on June 22, 2013. According to Mr. Ham, he asked the victim about the shooting, and the victim advised,

> 'Cause I tried walking up on him and tried to hit him, and he started reaching . . . . I got myself shot. I wasn't even mad at Fat Cat,[3] 'cause anybody knows you see somebody reaching for a gun, why would you even reach for a gun, and he telling you, 'Don't do it. Don't do it.' Fat Cat telling you, 'Don't do it.' It's . . . like I said, I'm new to the game. That's why I was going . . . .

Mr. Ham then asked the victim why he pulled the gun, to which the victim replied, "Heat of the moment. I knew he wasn't going to pay me my money anyway." The victim also told Mr. Ham that his father was not with him that day and that he did not see him until after he got shot. According to the victim, his father came to him while he was lying on the ground and asked, "You got a gun?" The victim replied, "It's right there," to which his father responded, "I got you now." Mr. Ham confirmed that the victim meant "new to the game" of selling drugs in his statement.

The State called Rebecca Byers, an evidence technician with the KPD, in rebuttal. She stated that five spent shell casings were recovered from one general area at the scene and that they were all .40 caliber Smith and Wesson casings. She also identified a photograph of the victim at the hospital and, based upon that photograph, testified that the victim had a bullet wound to his back in the upper shoulder area.

Following the conclusion of the proof, the jury found the Defendant guilty of misdemeanor reckless endangerment as a lesser-included offense of attempted first degree murder; not guilty of employment of a firearm during the commission of dangerous felony; guilty as charged of unlawful possession of a weapon; and guilty as charged of aggravated assault. Thereafter, the trial court imposed concurrent terms of eleven-months and twenty-nine days for the misdemeanor reckless endangerment conviction; two years for the unlawful possession of a weapon conviction[4]; and five years for the aggravated assault conviction. This timely appeal followed.

---

[3] Fat Cat refers to the Defendant.

[4] The Defendant was convicted under a prior version of section Tennessee Code Annotated section 39-17-1307, for which his crime of unlawful possession of a firearm was only a Class E felony. This offense is presently delineated as a Class D felony.

-6-

ANALYSIS

On appeal, the Defendant contends (1) that the trial court erred by allowing the State to argue that the Defendant was engaged in unlawful activity and was, therefore, not excused from the duty to retreat under a theory of self-defense; (2) that the trial court's response to a question from the jury during deliberations about a person's duty to retreat when engaged in an unlawful activity was in error; and (3) that the evidence is insufficient to support his convictions. We will address each in turn.

*I. Duty to Retreat*

First, the Defendant argues that the trial court erred "in permitting the State to offer proof and argue that the Defendant had a duty to retreat before resorting to deadly force in self-defense because at the time, [the] Defendant was engaged in . . . unlawful acts." Essentially, the Defendant contends that his actions were lawful. According to the Defendant, Tennessee Code Annotated section 39-17-1322 bars his prosecution for unlawful possession of a weapon because he employed a handgun in justifiable self-defense, and moreover, the drug sale should have been viewed as completed two days prior to the shooting and should not have been considered as "ongoing" in nature. Therefore, the Defendant surmises that the State should not have been permitted to argue that he was engaged in any "unlawful activity," thus, requiring a duty to retreat under the self-defense statute, Tennessee Code Annotated section 39-11-611(b). The State responds that the trial court properly declined to limit its argument in this regard, appropriately allowing evidence to be presented that the Defendant was engaged in unlawful activity, in the form of either a drug sale or unlawful possession of a weapon, and that the Defendant, therefore, had a duty to retreat before acting in self-defense.

Resolving these arguments involves principles of statutory construction. "The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995) (citing State v. Sliger, 846 S.W.2d 262, 263 (Tenn. 1993)). Where the statute's language is clear and unambiguous, we derive the legislative intent from its plain and ordinary meaning. State v. Collins, 166 S.W.3d 721, 726 (Tenn. 2005) (citing State v. Wilson, 132 S.W.3d 340, 341 (Tenn. 2004)). If, however, "the parties derive different interpretations from the statutory language, an ambiguity exists, and we must look to the entire statutory scheme in seeking to ascertain legislative intent." Owens, 908 S.W.2d at 926 (citing Lyons v. Rasar, 872 S.W.2d 895, 897 (Tenn. 1994)). In ascertaining the intent of the legislature, courts "'may look to the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment.'" Collins, 166 S.W.3d at 726 (quoting State v.

-7-

Gilliland, 22 S.W.3d 266, 275 (Tenn. 2000)). "Statutes 'in pari materia'—those relating to the same subject or having a common purpose—are to be construed together." Owens, 908 S.W.2d at 926 (citing Lyons, 872 S.W.2d at 897). Furthermore, the rules of statutory construction direct courts not to "apply a particular interpretation to a statute if that interpretation would yield an absurd result." State v. Sims, 45 S.W.3d 1, 11 (Tenn. 2001).

Tennessee's statute on self-defense provides, in pertinent part, as follows:

(b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b). The section referenced therein, section 39-17-1322, provides as a defense to prosecution,

A person shall not be charged with or convicted of a violation under this part if the person possessed, displayed or employed a handgun in justifiable self-defense or in justifiable defense of another during the commission of a crime in which that person or the other person defended was a victim.

The words "this part" include all of the criminal violations in part 13 of Tennessee Code Annotated chapter 39, title 17, or more specifically, Tennessee Code Annotated sections 39-17-1001 through 39-17-1364. "The criminal violations set forth in part 13 of title 39, chapter 17, comprise a diverse group of offenses involving a wide variety of weapons." State v. Tracey C. Clark, No. M2007-00496-CCA-R3-CD, 2008 WL 1699425, at *6 (Tenn. Crim. App. Apr. 10, 2008) (Woodall, concurring).

In State v. Tracey Clark, the defendant made a similar argument as presented herein, and the trial court granted the defendant's motion to dismiss the indictment for possession of a weapon on school grounds, concluding that the defendant had established to the court that he was acting in justifiable self-defense and that, therefore, section 39-17-1322 barred his prosecution. 2008 WL 1699425, at *1-2. This court reversed on appeal, rejecting the defendant's assertion that section 39-17-1322 "operates as a complete bar to indictment and prosecution for actions that are performed in 'self-defense.'" Id. at *3. In so holding, the court reasoned that the "justifiable self-defense" language of section 39-17-1322 served "as a directive to law enforcement and district attorneys that should they determine, based upon their investigation and using their discretion, that a person acted in justifiable self-defense, they shall not seek to indict that individual." Id. This section,

> along with others that grant legislative immunity for actions that ordinarily amount to criminal activity, "evidence the unambiguous legislative intent to pronounce the Tennessee public policy of encouraging citizens to rescue a person reasonably believed to be in imminent danger of death or serious bodily harm, and to protect a citizen who undertakes such heroic action from negative repercussions."

Id. (quoting Little v. Eastgate of Jackson, LLC, No. W2006-01846-COA-R9-CV, 2007 WL 1202431, at *9 (Tenn. Ct. App. Apr. 24, 2007)). The court continued,

> If the legislature had intended actions performed in "self-defense" to operate as an absolute bar to prosecution, then it would have been unnecessary to include the language that prohibits conviction in the statute. In other words, if the statute barred indictment, there would be no reason to address a conviction under Tennessee Code Annotated section 39-17-1322, as there can be no prosecution without a valid indictment.

Id. (citing Dykes v. Compton, 978 S.W.2d 528, 529-30 (Tenn. 1998)).

The court in Clark then determined that the trial court improperly took the role of fact-finder and usurped the role of the jury when it dismissed the indictment for possession of a weapon on school grounds, concluding from the facts that the defendant acted in justifiable self-defense. 2008 WL 1699425, at *5. In reaching its conclusion, this court explained,

> [B]y dismissing the indictment, the trial court found that the facts of the case would not support a conviction for possession of a weapon on school

-9-

grounds because [the defendant] was the victim of an assault and displayed his handgun in self-defense. This amounts, in our view, to a determination of facts that were "intertwined with the factual evidence of the defendant's conduct at the time of the alleged offense." [State v.] Goodman, 90 S.W.3d [557,] 562 [(Tenn. 2002)]. The trial court's actions amounted to a grant of summary judgment for [the defendant], which does not exist in criminal cases. See [State v.] Burrow, 769 S.W.2d [510,] 514 [(Tenn. Crim. App. 1989)]. In our view, the facts asserted in the motion and at the evidentiary hearing could only rationally bear upon the issue of guilt or innocence; therefore, they were improper for consideration on the motion to dismiss. Furthermore, the issue of self-defense is a matter for the jury to decide. State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

Id.

The Defendant argues that "[i]f conduct cannot, by direct prohibition, be the basis for a charge or conviction, how can it logically be considered the basis of a determination that the felon who has armed himself in self-defense is engaged in 'unlawful activity?'" In accordance with the rationale espoused by this court in Clark, we agree that section 39-17-1322 does not bar a charge or conviction for the Defendant's conduct in this case, and any issue in that regard, i.e., whether he was acting in justifiable self-defense, was a proper question for the jury. However, the issue of whether one was engaged in justifiable self-defense while unlawfully possessing a weapon does not equate to the issue of whether one was engaged in "unlawful activity" for the purposes of the self-defense statute requiring a duty to retreat. If we were to permit the State to argue that a felon in possession of a weapon asserting self-defense, without more, could satisfy the definition of "unlawful activity," such an interpretation would nullify the defense set forth in section 39-17-1322, leading to an absurd result. Accordingly, the State should not have been permitted to argue that the Defendant's conduct, a convicted felon for a drug offense arming himself with a weapon prior to the shooting, standing alone, could have formed the basis for the jury to conclude that the Defendant was engaged in "unlawful activity" for the purposes of the self-defense statute requiring a duty to retreat.

The Defendant also submits that he was not engaged in the "unlawful activity" of selling drugs at the time of the shooting. He reasons that the sale had been "completed two days prior when the contraband became the property of the buyer." Accordingly, the State should not have been allowed to present such an argument to the jury, in his opinion. We decline to adopt the assertion put forward by the Defendant because, here, we are dealing with the exchange of illegal narcotics, not a transfer of commercial goods. We agree with the trial court that this issue of whether the Defendant was still engaged in

-10-

a drug deal was factually driven. The Defendant by his own admission was the middleman between the victim and a third party seller. When the victim became displeased with the product shortly after the sale, he and his father returned to the seller's house to retrieve the victim's money—whether the Defendant was forced by the victim to return to the seller's house with them was a factual issue to be considered by the jury. They were unsuccessful at the seller's house, and when the Defendant heard the victim was looking for him, he sought out the victim while armed. According to the Defendant, he did so to negotiate a satisfactory outcome; however, when negotiations broke down, shots were fired. The Defendant was asking the trial court to make factual determinations reserved for the jury.

The term "unlawful activity" as used in section 39-11-611(b) is not defined. Regardless, "[w]here words and terms are in common use and are such as can be understood by persons of ordinary intelligence, it is not necessary, in the absence of anything in the charge to obscure their meaning, for the court to define or explain them." See State v. Summers, 692 S.W.2d 439, 445 (Tenn. Crim. App. 1985). We note that the parties seemingly argue both of these theories, unlawful possession of a weapon and selling drugs, in a vacuum as to whether they qualify as "unlawful activity" for purposes of the self-defense statue. However, we feel constrained to note that the jury was entitled to consider all of the facts and circumstances leading up to the Defendant's conduct in determining whether the Defendant's use of force in defending himself was reasonable, including whether he was engaged in "unlawful activity" at the time. See T.P.I. Crim. — 40.06(b)(2).

Although we conclude that the trial court erred in allowing the State's argument regarding unlawful possession of a weapon alone satisfied the definition of "unlawful activity," the jury in this case was charged that justifiable self-defense was a defense to the possession charge. Moreover, the jury was properly allowed to consider all of the Defendant's conduct leading up to the shooting in determining whether he was engaged in "unlawful activity" and, therefore, had a duty to retreat under section 39-11-611(b). Indeed, the question of whether the Defendant's actions were unlawful at the time of the shooting was a question for the jury in their role as fact-finders. Given the overwhelming evidence that the Defendant was engaged in "unlawful activity" at the time of the offenses, i.e., dealing drugs and all of his attendant conduct surrounding that transaction, and in light of the jury's decision to find the Defendant guilty of unlawful possession of a weapon with proper instructions, any error in permitting the State's argument was certainly harmless. The Defendant is not entitled to relief.

## II. Jury Instructions

The Defendant next contends that the trial court erred by failing to answer a question posed by the jury during its deliberations and instead simply referring them again to the pattern jury instruction on self-defense. The State responds that the trial court's response was proper.

At trial, the court instructed the jury on self-defense as follows:

Included in the defendant's plea of not guilty is his plea of self-defense.

If a defendant was not engaged in unlawful activity and was in a place where he or she had a right to be, he or she would have no duty to retreat before threatening or using force against the alleged victim when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use of unlawful force.

If a defendant was not engaged in unlawful activity and was in a place where he or she had a right to be, he or she would also have no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds.

In determining whether the defendant's use of force in defending himself was reasonable, you may consider not only his use of force but also all the facts and circumstances surrounding and leading up to it. Factors to consider in deciding whether there were reasonable grounds for the defendant to fear death or serious bodily injury from the alleged victim include but are not limited to any previous threats of the alleged victim made known to the defendant; the character of the alleged victim for violence, when known to the defendant; the animosity of the alleged victim for the defendant, as revealed to the defendant by previous acts and words of the alleged victim; and the manner in which the parties were armed and their relative strengths and sizes.

"Force" means compulsion by the use of physical power or violence.

"Violence" means evidence of physical force unlawfully exercised so as to damage, injure or abuse. Physical contact is not required to prove violence. Unlawfully pointing a deadly weapon at an alleged victim is physical force directed toward the body of the victim.

"Imminent" means near at hand; on the point of happening.

If evidence is introduced supporting self-defense, the burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense.

If from all the facts and circumstances you find the defendant acted in self-defense, or if you have a reasonable doubt as to whether the defendant acted in self-defense, you must find him not guilty.

See T.P.I. Crim. — 40.06(b)(2).

During deliberations, the jury presented a question to the trial court regarding the instructions on self-defense. The question reads: "Does unlawful act preclude act of self-defense as a defense plea?" The trial court then discussed with the parties the proper response. Defense counsel asked the court to provide a supplemental instruction stating that "unlawful act" only goes to the question of whether the Defendant had a duty to retreat and additionally instruct that the Defendant has no duty to retreat if he cannot do so safely. The State requested that the trial court just "reread" the instruction on self-defense. The trial court then responded to the jury's inquiry as follows: "Dear Jurors, I will refer you back to the instructions, specifically page 16, which explains the law of self-defense." This was the "safest and most accurate response" in the trial court's opinion because to do otherwise may have "run the danger of improperly influencing their verdict."

Under Tennessee law, a trial court has a duty to provide "a complete charge of the law applicable to the facts of the case." State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)); see also Tenn. R. Crim. P. 30(d)(2). A charge "should not contain inaccurate or inapplicable statements of legal principles that might tend to confuse the jury." State v. Hatcher, 310 S.W.3d 788, 812 (Tenn. 2010) (citations omitted). Tennessee law, however, does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. See State v. West, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531 (Tenn. 1977)). As a mixed question of law and fact, our standard of review for questions concerning the propriety of jury instructions is de novo with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

Trial courts have "the authority to respond to jury questions with a supplemental instruction." Forbes, 918 S.W.2d at 451. However, the Defendant has not cited to any

authority which states that a trial court is obligated to answer the jury's questions during deliberations or give a supplemental instruction in light of the jury's question. See, e.g., State v. Jim Gerhardt, No. W2006-02589-CCA-R3-CD, 2009 WL 160930, at *13 (Tenn. Crim. App. Jan. 23, 2009) (finding that no clear or unequivocal rule of law had been breached when the trial court simply referred the jury back to the initial charge in response to the jury's note: "Please define a criminal intent attempt of child abuse and neglect. Does it matter if he (defendant) knew what he did would cause harm?"; and the word "intent" was struck through). We are aware that this court has previously reversed a defendant's conviction for failure to issue a supplemental instruction in light of an erroneous jury instruction. See, e.g., State v. Robinson, 239 S.W.3d 211, 226-28 (Tenn. Crim. App. 2006) (trial court's failure to answer jury question and issue supplemental instruction regarding inability of accomplices to corroborate each other where initial jury instruction did not inform jury of this "well-settled law" constituted reversible error). However, on appeal, the Defendant does not argue that the jury instruction on self-defense was erroneous. Instead, the Defendant argues that "[a] certain way to assure that the jury understood that 'unlawful activity' is only a consideration as to a duty to retreat is to tell them so directly and answer the question directly." According to the Defendant, the trial court's response did not address the jury's misunderstanding. The Defendant also requested that the trial court clarify for the jury that there is no duty to retreat if such cannot be accomplished safely.

"Under the 'true man' doctrine, one need not retreat from the threatened attack of another even though one may safely do so. Neither must one pause and consider whether a reasonable person might think it possible to safely flee rather than to attack and disable or kill the assailant." State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995). Tennessee's law of self-defense in the use of deadly force, Tennessee Code Annotated section 39-11-611(b), adheres to the true man doctrine. The statute also requires that one be in a place where he has a right to be and not be engaged in any unlawful activity before there is no duty to retreat. See State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013) ("To prevail on a theory of self-defense, a defendant must show that he or she was 'not engaged in unlawful activity' and was 'in a place where the person has a right to be.'"); State v. Zachary Carlisle, No. W2012-00291-CCA-MR3-CD, 2013 WL 5561480, at *18-19 (Tenn. Crim. App. Oct. 7, 2013) (concluding that the defendant was not entitled to a self-defense instruction because he was engaged in illegal activity, i.e., a drug deal with the victim at the time of the murder, and because no evidence in the record suggested the victim threatened the defendant with a deadly weapon or force). As discussed in the section above, the State was properly allowed to argue, and the jury was correctly allowed to consider, that the Defendant was engaged in unlawful activity and, therefore, had a duty to retreat pursuant to the self-defense statute.

-14-

The trial court's instruction on self-defense was a proper statement of the law. The instruction tracks the language of the relevant statute, see Tennessee Code Annotated section 39-11-611(b), and it follows the pattern jury instruction, as provided in the Tennessee Pattern Jury Instructions. Additionally, when a court chooses to repeat instructions or give supplemental instructions, the instructions must be:

> (1) appropriately indicated by questions or statements from jurors, or from the circumstances surrounding the deliberative and decisional process, (2) comprehensively fair to all parties, and (3) not unduly emphatic upon certain portions of the law to the exclusion of other parts equally applicable to the area of jury misunderstanding or confusion.

Berry v. Conover, 673 S.W.2d 541, 545 (Tenn. Ct. App. 1984). The trial court's ruling indicates that it choose not to issue a supplemental instruction for fear such instruction would be "unduly emphatic upon certain portions of the law to the exclusion of other parts equally applicable to the area of jury misunderstanding or confusion." The trial court also noted that the instruction on self-defense was an accurate statement of the law and that the defense was permitted to argue to the jury "that someone shouldn't have to retreat if they can't do so safely." We find no error in this regard.

We conclude that the trial court's jury instruction on self-defense fairly submitted the legal issues, including that one only has a duty to retreat if engaged in unlawful activity, and did not mislead the jury as to the applicable law. As such, the trial court's referring the jury to its charge without giving an additional instruction was an appropriate response. The Defendant is therefore denied relief on this issue.

### III. Sufficiency of the Evidence

Next, the Defendant challenges the sufficiency of the convicting evidence supporting his convictions for misdemeanor reckless endangerment and aggravated assault. He argues that the State failed to provide any evidence that contradicted his theory of self-defense, neither testimony from an eyewitness or a police officer, nor the condition of the scene, nor any medical evidence. Specifically, he states,

> While the jury is free to accept or reject any witness, the verdict does not indicate rejection of the testimony of any eyewitnesses or the Defendant's theory of the facts. Rather, the verdict is more indicative of jury confusion about the effect of the 48-hour[-]old drug deal on [the Defendant's] opportunity to claim self-defense.

-15-

In response, the State contends that the evidence is sufficient to support these convictions and that a reasonable juror could have rejected the Defendant's claim of self-defense.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). Further, it is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "Encompassed within that determination is whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." State v. Thomas Eugene Lester, No. 03C01-9702-CR-00069, 1998 WL 334394, at *2 (Tenn. Crim. App. June 25, 1998) (citing Renner, 912 S.W.2d at 704). It is within the prerogative of the jury to reject a claim of self-defense. See Goode, 956 S.W.2d at 527. Upon our review of a jury's rejection of a claim of self-defense, "in order to prevail, the defendant must show that the

-16-

evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

Some of the Defendant's arguments are superfluous, most being rendered moot by our conclusions in the above sections of this opinion. First, as detailed previously, the jury was entitled to consider all of the facts and circumstances leading up to the Defendant's conduct in determining whether the Defendant's use of force in defending himself was reasonable, including whether he was engaged in "unlawful activity" at the time. We have also noted that the trial court's instruction on self-defense was a proper statement of the law and concluded that the trial court did not err by declining to clarify the instruction in any regard. Thus, we disagree with the Defendant's assertion that "the verdict is more indicative of jury confusion about the effect of the 48-hour-old drug deal on [his] opportunity to claim self-defense."

The Defendant argues that the evidence shows that he acted in self-defense when he fired several rounds at the victim. As outlined in detail above, a person has no duty to retreat and can use force against another "when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force," provided the person "is not engaged in unlawful activity and is in a place where the person has a right to be." Tenn. Code Ann. § 39-11-611(b). However, a claim of self-defense is not available when the real or apparent necessity to use force is brought about by the "design, fault or contrivance of the defendant." See Floyd v. State, 430 S.W.2d 888, 890 (Tenn. Crim. App. 1968).

"Reliance on self-defense is not limited to the exact moment of the assault [but] may be considered in connection with the entirety of the events leading to the assault." Ivy, 868 S.W.2d at 727 (citing Allsup v. State, 73 Tenn. 362 (1880)). The same is true for the jury's rejection of a self-defense claim—they are entitled to consider the entirety of the events leading up to the offenses. Viewed in the light most favorable to the State, the evidence shows that the Defendant was engaged in unlawful activity at the time of these acts—being the middleman in "a drug deal gone bad" and possessing a weapon while trying to locate the victim who had made threats against the Defendant. The Defendant armed himself and sought out to the victim to engage in further "negotiations" about the victim's dissatisfaction with the drugs. The Defendant, knowing that the victim was armed, approached the victim and did not retreat. The Defendant drew his gun first, and when the victim turned to run, shot him multiple times.

The evidence is sufficient to support a conclusion beyond a reasonable doubt that Defendant did not act in self-defense when he shot the victim. The jury accredited some

of the Defendant's evidence as shown by their decision to convict him only of misdemeanor reckless endangerment as a lesser-included offense of attempted first degree murder and by their not guilty verdict of employment of a firearm during the commission of a dangerous felony offense. As this court has previously stated, "[i]t is the jury's province, as the trier of fact, to determine which parts of the testimony and evidence to credit, and there is no requirement that a jury must wholly accept or reject a witness's account of events." State v. Gene Shelton Rucker, Jr., No. E2002-02101-CCA-R3-CD, 2004 WL 2827004, at *6 (Tenn. Crim. App. Dec. 9, 2004) (citing State v. Bolin, 922 S.W.2d 870, 876 (Tenn. 1996)). "The jury was entitled to accept that part of the [D]efendant's proof they felt was consistent with truth and reject that portion they believed originated in falsity." State v. Gilbert, 612 S.W.2d 188, 190 (Tenn. Crim. App. 1980).

Finally, as to his conviction for unlawful possession of a weapon, the Defendant "contends that, having established that his possession of a firearm as a convicted felon was in self-defense by one faced with an illegal attack he cannot be convicted under any offense in part 17 including Tenn[essee] Code [Ann]otated [section] 39-17-1322." We have previously dispensed with this argument herein. Accordingly, we conclude that the evidence is sufficient to support all of the Defendant's convictions.

CONCLUSION

Based upon the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

-18-